UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALVIN LLOYD, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-6225 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| WHIRLPOOL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Alvin Lloyd smacked his head on the hood of his stove when he rushed to save burning bacon. Moments before the collision, he was working on his laptop at a kitchen counter while turkey bacon sizzled in a nearby skillet. That lunchtime multi-tasking took a turn for the worse when he started smelling something burning. He ran to rescue his bacon, and in the process, he collided with the island canopy range hood. So he sued Defendant Whirlpool, the hood's manufacturer.

Lloyd brought strict liability and negligence claims against Whirlpool based on the content of the hood's instruction manual. He does not claim a failure to warn. Instead, Lloyd faults the company for giving a minimum installation height of 24 inches, without telling installers that it was possible to install the hood higher.

As Lloyd sees it, Whirlpool's failure to mention that possibility in the instruction manual was a design defect. He claims that he would not have suffered an injury if the range hood was more than 24 inches above the cooking surface.

After discovery, Whirlpool moved for summary judgment. For the following reasons, Whirlpool's motion for summary judgment is granted.

**Background**

On October 18, 2017, Alvin Lloyd was in his apartment in Oak Park, and he got a little hungry. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 17, 20 (Dckt. No. 104). He decided to cook turkey bacon and ramen noodles for lunch. *Id.* He started by heating a skillet and a pot of water on his cooking surface. *Id.* at ¶ 21. The cooking surface sat on an island in his kitchen, with a range hood – a ceiling canopy designed to capture steam, smoke, and other kitchen odors – hanging right above the surface. *Id.* at ¶ 5.

The parties don't know when, exactly, the range hood was installed in that apartment. They know that the installation took place before 2007 (maybe because of the model, but the parties don't explain it). *Id.* at ¶ 19. They believe that installation likely took place in the 1990s, but they don't know for sure. *Id.*; *see also* Shalo Dec., at ¶¶ 4–5 (Dckt. No. 97-8) (a declaration from the owner of the building). The punchline is that the installation took place at least a decade before the Lloyds moved in. *Id.*; *see also* Linda Lloyd Dep., at 19:11-19 (Dckt. No. 97-9) (stating that they moved in at some point in August 2017, two months before the accident).

The hood and the installation instructions are two of the three characters in the story. So before the Court explains how lunch took a turn for the worse, it helps to explain the design of the hood and the content of the manual.

The hood is an Isola model, manufactured by Faber S.p.A. and sold by Whirlpool (under the KitchenAid brand). *Id.* at ¶ 6. It's known as the 36" Island Canopy Range Hood. *Id.*

The range hood came with a seven-page installation manual. *See* Installation Guide (Dckt. No. 97-2). The second page included a few basic diagrams of the hood, including a picture of the hood above a stove. *Id.* at 2. The drawing included a number of arrows and measurements, showing the distance between various points. *Id.* An arrow appeared between

2

the cooking surface and the hood, next to the following text: "24 [inch] min. bottom of canopy to cooking surface." *Id.*; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 6 (Dckt. No. 104).

Here is the picture from the manual. Notice the text on the left, between the cooking surface and the hood:



Sure enough, Lloyd's hood hung about 24 inches above his cooking surface. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 8 (Dckt. No. 104). But how it got there is a mystery.

3

The parties don't know who installed it. *Id.* at ¶ 16. There is nothing in the record about why the installer selected that height, or whether that person ever looked at the manual.

For Whirlpool to sell a product (like that hood) in the United States, the product must pass a conformity assessment and receive certain safety certifications. *Id.* at ¶ 10. A servicer, Underwriters Laboratories, certified the hood in this case. *Id.* at ¶¶ 10–11. The 24-inch minimum height listed in the hood's installation guide was a standard requirement by Underwriters Laboratories when that hood was made. *Id.* at ¶ 12. And Whirlpool included the 24-inch minimum in the guide before receiving certification (meaning that Underwriters Laboratories presumably saw and approved that instruction). *Id.* at ¶ 13.

The installation manual included a minimum because a range hood cannot sit too low, meaning too close to the cooking surface. Otherwise, the heat of the stovetop could melt the electric circuitry inside the range hood. *Id.* at ¶ 12; *see also* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 4, 11 (Dckt. No. 106).

Although 24 inches was the minimum, the range hood did not need to hang that low. A user could adjust its height. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 14 (Dckt. No. 104). The range hood could function properly at a height of 36 inches above the cooking surface. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 9 (Dckt. No. 106).

Whirlpool offers evidence that the hood's maximum height ultimately depended on the height of the ceiling. *See* Def.'s Statement of Facts, at ¶ 14 (Dckt. No. 97). A higher ceiling could accommodate a higher hood. The ceiling in Lloyd's kitchen was nine feet, four inches tall. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 20 (Dckt. No. 106).

But putting the hood too high has potential downsides, too. A hood typically has a fan, and a light. Presumably, the higher the hood, the less effective the fan and the light. And people

need to reach it, too, including short people. *Id.* at ¶ 8. That's why you don't see range hoods installed five feet above the cooking surface.

Lloyd contends that Whirlpool, Faber, and the industry considered 36 inches above the cooking surface to be the maximum height for the hood to remain effective. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 14 (Dckt. No. 104, at 3 of 329); Pl.'s Statement of Additional Facts, at ¶ 10 (Dckt. No. 104, at 6 of 329). Whirlpool disagrees. It provides evidence that the 36-inch standard was used only for later Isola hood models, which are irrelevant to this case. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 10 (Dckt. No. 106).

For now, it doesn't make much difference if 36 inches was the maximum height. The point is that the hood could have gone more than 24 inches above the cooking surface, but probably not more than 36 inches.

The difference between 24 inches and 36 inches is the key to Lloyd's case. His hood hung 24 inches above the stovetop, but he thinks that it could have been installed higher – up to 36 inches.

Imagine your average cooking surface, which is 36 inches off the ground. *See* Pl.'s Resp., at 1–2 (Dckt. No. 103). If the hood is only 24 inches above that surface, then the bottom of the hood would be about 60 inches off the ground (*i.e.*, five feet), or a little bit more.

As an aside, the parties don't explain the measurements in very much detail. The parties agree that the stove had a height of 36 inches, and that the hood was 24 inches above the cooking surface. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 12 (Dckt. No. 106). That's 60 inches – five feet tall.

But the parties also agree that the bottom of the hood stood at 5 feet, 3 inches. *Id.* That's 63 inches, not 60 inches. The parties don't explain where those three extra inches came from. Still, the Court accepts that the bottom of the hood was 5 feet, 3 inches above the floor.

Five feet, three inches is not very tall. It is shorter than about 95% of the population. *Id.* at ¶ 13. For most people, it is lower than the top of their heads.

On the other hand, if the hood had hung 36 inches above the cooking surface, then the hood would have been 74 inches, or 6 feet and 2 inches, off the ground. (Again, the math seems a little off, but the Court will put it aside.)[1] *Id.* at ¶ 14 ("If installed at 36 inches above the cooking surface (the burners), the range hood would have been 74 inches off the floor.").

That's a lot taller. In the United States, adult males who are between 71.8 and 73.8 inches fall within the 95th percentile for height. *Id.* at ¶ 15. So a hood with a 36-inch gap above a 36-inch-tall cooking surface would hang above most men (and above most women, too).

At that height, the hood would have hung a little above Lloyd himself, but not by much. Lloyd is about 5 feet, 11 inches tall. *Id.* at ¶ 16. He would have had three inches of clearance.

Lloyd's hood hung at the minimum height, 24 inches above the cooking surface. The record includes a picture of the range hood in Lloyd's kitchen, with Lloyd's wife standing next to it for perspective. *See* Pl.'s Ex. 10 (Dckt. No. 104, at 218 of 329); *see also* Photo (Dckt. No. 97-7); Andre Report, at 5, 6, 8 (Dckt. No. 104, at 123, 124, 126 of 329) (showing additional pictures). By the look of things (it's hard to say for sure, given the camera angle), the bottom of the hood is roughly at nose level.

---

[1] Again, presumably, it would be 72 inches, which includes 36 inches from the floor to the top of the cooking surface, plus 36 inches from the cooking surface to the range hood. Here, the parties add only two additional inches, not three. The Court doesn't know where the one inch went, but it will use the parties' agreed-upon numbers.

6

The parties agree that the instruction manual for this hood did not *require* a user to install the hood at the minimum height, meaning 24 inches above the cooking surface. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 14 (Dckt. No. 104). The parties also agree that the manual offered no guidance on the maximum distance between the cooking surface and the hood. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 1 (Dckt. No. 106); Installation Guide (Dckt. No. 97-2). The manual provided a floor, but not a ceiling.

The manual also did not come out and say that Whirlpool recommended a height of 24 inches above the cooking surface. The manual simply said that 24 inches was the *minimum* height. So, it said the minimum height, not the maximum height. And it did not say the right height.

With those details in hand, the Court returns to the story. Recall that Lloyd started cooking turkey bacon on the stove. This wasn't his first rodeo. He had cooked turkey bacon before, in the same kitchen, on the same surface. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 22 (Dckt. No. 104).

Lloyd was working from home when he decided to make lunch. *Id.* at ¶ 23. While the bacon was simmering on his stove, he brought his laptop into the kitchen and multitasked. *Id.* He worked from a kitchen counter, with his back turned to the cooking surface. *Id.* at ¶¶ 23–24. The cooking surface sat behind him on the far side of a kitchen island. *Id.* at ¶ 26.

Before long, Lloyd noticed that his food was burning. *Id.* at ¶ 25. He "lurched up" and "rushed" to the stove to remove the pot and skillet. *Id.* at ¶ 26; *see also* Andre Report, at 6 (Dckt. No. 104, at 124 of 329) (stating that Lloyd "leaped" to save his burning bacon). Lloyd came at the stove from the far side of the island, instead of going around the island to the front of

7

the stove. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 26 (Dckt. No. 104). But as he approached, he struck his head on the back corner of the hood. *Id.*

Lloyd testified that he was "concentrating on something else," so the burning food "caught [him] off guard" and it "became an emergency situation." *Id.* at ¶ 27. He didn't take the extra time to walk to the front of the stovetop because "it was a quick emergency response" to save his charring turkey bacon. *Id.* at ¶ 28.

The island and the hood were visible to anyone in the kitchen. *Id.* at ¶ 30. And Lloyd's wife had told him before that he could hit his head on the range hood, given its height. *Id.* at ¶ 31. But the exigencies of the moment led to a rush, and he cracked his head on the back corner anyway.

Lloyd testified that he "became dazed." *See* Lloyd Dep., at 41:17-18 (Dckt. No. 97-4). And then his wife came in. "I told her I had struck the hood, and she looked at me. She said, well, you're not bleeding, nothing, you know. She said, put some ice on it." *Id.* at 41:22-24.

Alvin Lloyd is not the only member of his family to have hit his head on the range hood. His wife and his teenage daughter have bumped their heads on the hood, too. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 18 (Dckt. No. 106).

Nationwide, plenty of people have thumped their heads on range hoods. Lloyd's expert opined that in 2016 (the year before this incident), emergency rooms reported around 232 head injuries from range hoods.[2] *Id.* at ¶ 19.

---

[2] To be fair to range hoods, Lloyd's expert called this total "an exceedingly small accident mode" compared to other household items. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 19 (Dckt. No. 106); Arndt Report, at 19 (Dckt. No. 104, at 312 of 329). It ranked 20th out of 20 items, and was significantly behind the 19th place finisher – which was dishwashers with 692 injuries. *See* Arndt Report, at 20.

Lloyd ultimately sued Whirlpool in state court. *See* Cplt. (Dckt. No. 1-1). He brought two product liability claims: strict liability, and negligence. Whirlpool, in turn, removed the case to federal court. *See* Notice of Removal (Dckt. No. 1); 10/9/19 Mem. Opin. & Order (Dckt. No. 15); 2/10/20 Order (Dckt. No. 35). Discovery came and went. Whirlpool later moved for summary judgment on both counts. *See* Mtn. for Summ. J. (Dckt. No. 95).

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute about any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

9

**Analysis**

Whirlpool moved for summary judgment on both the strict liability claim (Count I) and the negligence claim (Count II). *See* Def.'s Mem. in Support of Summ. J., at 3–14 (Dckt. No. 96). In response, Lloyd waved the white flag on the strict liability claim. Whirlpool and Lloyd agree that the strict liability claim is time barred by the statute of repose. *Id.* at 12–14; Pl.'s Resp., at 5 (Dckt. No. 103). The Court grants Whirlpool's motion for summary judgment on Count I.

The negligence claim is all that remains. *See* Cplt., at 4–5 (Dckt. No. 1-1). A products liability claim sounding in negligence can come in a few different flavors. "A product can be defective because of a manufacturing defect, a design defect, or a lack of adequate instructions and warnings." *Weigle v. SPX Corp.*, 729 F.3d 724, 731 (7th Cir. 2013).

Lloyd's claim centers on the hood's instruction manual. To most readers, it probably sounds like "a lack of adequate instructions and warnings." *Id.* That sort of claim is often called a failure to warn.

But Lloyd clarifies that he isn't bringing a failure-to-warn claim. "This is not a run of the mill duty to warn case. No allegation is made in the complaint that Defendant should have affixed a label to the product, or inserted a warning in the manual, warning of the risks of striking one's head when the product was installed at 24 inches over the cook surface." *See* Pl.'s Resp., at 6 (Dckt. No. 103); *see also id.* (reiterating that "a duty to warn about the dangers of a product . . . is not the gravamen of Plaintiff's case"); *id.* at 7 ("Plaintiff here is not alleging a failure to warn about the danger of striking one's head."); *id.* at 10 ("Here, the failure is not alleged to be a failure to warn of a danger . . . .").

Instead, Lloyd argues that he is bringing a design defect claim. *Id.* His claim is about the height of the hood and the content of the manual. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 7 (Dckt. No. 104) ("Plaintiff testified that the only issue he had with the design and installation of the range hood was the height at which it was installed.").

Lloyd offers two negligence theories about the design of the hood. First, Lloyd argues that the instruction manual encouraged users to install the hood at a height of 24 inches above the cooking surface. In his view, giving the minimum safe distance between the cooking surface and the hood, without any other instructions, suggested that 24 inches was the *right* distance.

Second, Lloyd contends that the manual failed to specify that users should install the hood at 36 inches above the cooking surface, and failed to disclose that the hood could work efficiently at a distance of up to 36 inches above the cooking surface. *See* Pl.'s Resp., at 6 (Dckt. No. 103); *see also* Cplt., at ¶ 14 of Count II (Dckt. No. 1-1). Together, according to Lloyd, these failures amounted to a design defect.

The Court is skeptical that information (or lack of information) in an instruction manual is part of a product's design. The manual is information about the product; it is not the product itself. A manual may give information about the design (such as a warning), but a manual does not seem to be part of the design. An inventor's blueprint is unlikely to contain a sketch of the instruction booklet.

Even so, Whirlpool does not dispute Lloyd's characterization of his claim. And Whirlpool does not argue that a manual cannot give rise to a design defect claim. So the Court will take the claim as it comes, and will take it as a given that a manual can give rise to a negligent design defect claim. The question is whether there is enough evidence to get to a jury.

11

"A products liability action asserting a claim based on negligence, such as negligent design, falls within the framework of common law negligence. Thus a plaintiff must establish the existence of a duty of care owed by the defendant, a breach of that duty, an injury that was proximately caused by that breach, and damages." *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 309 Ill. Dec. 383, 864 N.E.2d 249, 263 (2007) (citation omitted); *see also Weigle*, 729 F.3d at 731.

To prevail, Lloyd would need to prove a few things. First, Whirlpool had a duty to provide guidance in the instruction manual about the possibility of installing the hood at a height up to 36 inches. Second, Whirlpool failed to provide that guidance. And third, the lack of guidance proximately caused Lloyd's injury.

Whirlpool argues that Lloyd cannot prove the existence of a duty, and cannot prove proximate causation. *See* Def.'s Mem. in Support of Summ. J., at 3–12 (Dckt. No. 96). On the existence of a duty, Whirlpool focuses on whether the hood and the instruction manual were unreasonably dangerous, citing two different tests under Illinois law. *Id.* at 3–9.

This Court will put to the side whether Whirlpool had a duty to offer more information in the manual. The record cannot support a finding of proximate causation. And without proximate causation, Lloyd cannot prove negligence.

Under Illinois law, "[t]he term 'proximate cause' encompasses two distinct requirements: cause in fact and legal cause." *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 290 Ill. Dec. 525, 821 N.E.2d 1099, 1127 (2004). "[T]he lack of proximate cause may be determined by the court as a matter of law where the facts alleged do not sufficiently demonstrate both cause in fact and legal cause." *Id.* at 1128.

Cause in fact, or but-for cause, "is present 'when there is a reasonable certainty that a defendant's acts caused the injury or damage.'" *Id.* (quoting *Lee v. Chicago Transit Auth.*, 152 Ill. 2d 432, 178 Ill. Dec. 699, 605 N.E.2d 493, 502 (1992)). Specifically, the court "ask[s] whether the injury would have occurred absent the defendant's conduct." *Id.*

Legal cause exists "only if the defendant's conduct is 'so closely tied to the plaintiff's injury that he should be held legally responsible for it.'" *Id.* (quoting *Simmons v. Garces* 198 Ill. 2d 541, 261 Ill. Dec. 471, 763 N.E.2d 720, 732 (2002)). Legal causation "is essentially a question of foreseeability." *See Lee*, 605 N.E.2d at 456. That is, legal cause is a policy question, asking how far causation (and therefore liability) *should* extend.

Lloyd argues that the instruction manual proximately caused his injury. His causation theory seems to blend together factual and legal causation, without breaking them out.

Lloyd's causation theory rests on the fact that the manual failed to mention that a user could install the hood at a height of up to 36 inches. *See* Pl.'s Resp., at 6 (Dckt. No. 103). Even though Whirlpool knew that the hood could function at 36 inches, it "did not require the hood to be installed at that height or even intimate that 36 inches was possible." *Id.* at 9. Instead, the manual listed only a *minimum* installation height: 24 inches above the cooking surface. *Id.* at 1; Installation Guide, at 2 (Dckt. No. 97-2).

To Lloyd, the height of the hood caused his injury. As he sees it, giving the minimum installation height would "mislead" installers into placing the hood at that height. *See* Pl.'s Resp., at 9 (Dckt. No. 103). And that height posed a foreseeable danger. Kitchens are hectic places where stovetop fires sometimes happen. *Id.* In fact, Whirlpool designs its range hoods to handle fires. *Id.* With low-hanging hoods amidst the chaos created by kitchen fires, someone was bound to hit their head. *Id.* Indeed, other members of the Lloyd family had hit their heads,

13

too. *Id.*; *see also* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 18–19 (Dckt. No. 106). So, as Lloyd sees it, Whirlpool should have foreseen that the hood's defective manual created a hazard in an already hazardous place.

The Court disagrees. On this record, no reasonable jury could conclude that the manual was the factual cause or the legal cause of the injury.

The record does not show that the manual was a but-for cause of his injury. Again, factual causation asks "whether the harm could have occurred without the alleged tortious act." *See Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018).

The instruction manual is the starting point. It gave a minimum height for the hood, without addressing whether the hood could go higher than 24 inches above the cooking surface. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 6 (Dckt. No. 104); Installation Guide, at 2 (Dckt. No. 97-2).

The claim is about the manual, so Lloyd must prove that the content of the manual was a but-for cause of the accident. To establish but-for causation, Lloyd would have to prove that the hood would have been higher if the manual had offered a different instruction. And then, Lloyd would have to prove that placing the hood at a different height would have prevented his injury. Without those two points, Lloyd cannot prove that the manual was the but-for cause of his injury.

On this record, whether the manual played a role in the accident is anyone's guess. Someone – no one knows who – installed the hood at least a decade earlier, and decided to install it 24 inches above the stovetop. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 8 (Dckt. No. 104). The record is silent on whether that person had a copy of the installation manual, let alone read it, let alone consciously followed it, let alone would have selected a different height if the manual had expressly told him about that possibility.

Lloyd believes that Whirlpool's manual should have said that the hood could sit up to 36 inches above the stovetop. So, in that scenario, the height for the hood could span from 24 to 36 inches above the cooking surface.

Under Lloyd's theory, the installer had discretion when selecting the height. The installer could have installed the hood 24 inches above the cooking surface, or could have gone up to 36 inches, or could have picked something in between. Even if the installation guide had listed a maximum height of 36 inches, that leaves 12 inches for the anonymous installer to exercise discretion.

In other words, even under Lloyd's theory, the installer had room to maneuver. Lloyd believes that the manual should have shown a minimum height of 24 inches, and a maximum height of 36 inches. Those parameters leave 12 inches of discretion.

Lloyd's theory works only if the installer would have read those instructions, followed them, and then installed the hood more than 24 inches above the stovetop. But there is no support in the record for the notion that giving a maximum height would have made a difference to the installer, whoever he was.

To find causation in fact, a jury would need to find that the installer would have (1) read the manual, (2) seen that the hood could sit up to 36 inches above the stovetop, (3) installed the hood at a different height, and (4) installed the hood at a height that was tall enough to avoid the injury (somewhere between 24 inches and 36 inches). There is no such evidence in the record.

What's more, the record does not support the notion that the accident would not have happened if the installer had put the hood more than 24 inches above the stovetop. And the math is against Lloyd.

15

The parties agree that the hood would have hung 74 inches off the floor if it was installed 36 inches above the stovetop. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 14 (Dckt. No. 106). That's six feet, two inches.

Lloyd is almost six feet tall. He is five feet, eleven inches. That's 71 inches (without shoes – and the Court assumes, for the sake of argument, that he wasn't wearing shoes). So, he was only three inches shorter than the bottom of the hood, even if the hood was hung at the maximum height of 74 inches off the ground.

That's nine inches of definite danger (out of 12 inches). If the installer had placed the hood nine inches higher than it was – so, at roughly 71 inches – the hood would have hung at the same height as Lloyd's head. In other words, under Lloyd's theory, the installer should have had 12 inches of discretion (that is, the discretion to put the hood at a height somewhere between 24 inches and 36 inches above the cooking surface). But for the first nine inches, Lloyd would have hit his head anyway. Three-quarters of the discretionary length (*i.e.*, the first nine inches of the 12 inches) still would have led to a head smack.

Even if the installer had raised the hood higher – somewhere between nine to twelve inches – Lloyd was not in the clear. Installing the range hood at a height of 71–74 inches could have led to an injury. He would have hit his head if he was elevated by even the smallest amount – say, by walking or leaping to save burning bacon.

When people walk, the height of their head changes. People go up when they take a step, and then come back down. When you walk, the top of your head is above the height of your head when you are standing still. You can test this theory by walking under a closet door that is roughly your height, and see what happens.

16

When people are in a hurry, they tend to go even higher. When people run, their feet leave the ground. That momentarily flight raises the head even higher. Again, try running under a low closet, and it will drive the point home.

To establish causation, Lloyd would need to offer evidence that he would not have hit his head if the range sat 36 inches above the stovetop. But here, that proposition is entirely speculative. Lloyd was in a big hurry to save the bacon. He "'lurched up' and rushed to the stove" to rescue his lunch. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 26 (Dckt. No. 104); *see also id.* at ¶ 27 ("Plaintiff also testified that he did not walk to the front of the island because 'to me it was a quick emergency response.'").

Maybe Lloyd would have hit his head on the hood anyway, even if the hood sat 36 inches above the stovetop. Or maybe not. For present purposes, the key point is that Lloyd offers no evidence that a different height would have prevented the accident. To prevail at trial, Lloyd would need to prove that he would not have hit his head if the hood was higher. But he offers no such evidence. Lloyd was a tall guy on the run, and the top of his head was in potential peril even under his theory of the case.

In his Rule 56.1 statement of facts, Lloyd stated that "if the rangehood had been installed at 36 [inches] from the cooking surface, Plaintiff would not have hit his head as he reached for the burning skillet." *See* Pl.'s Statement of Additional Facts, at ¶ 17 (Dckt. No. 104, at 7 of 329). Noticeably missing is any citation to the record. He does not cite any deposition testimony, or any expert report, or anything else to support the notion that a different height would have prevented the accident.

His proffered fact is supported by nothing, so it counts for nothing. *See* L.R. 56.1(d) ("Each asserted fact must be supported by citation to the specific evidentiary material, including

17

the specific page number, that supports it. The court may disregard any asserted fact that is not supported with such a citation."). Without any evidence that a better manual would have prevented the injury, Lloyd cannot prove but-for causation.

The record does not support the notion that the content of the manual was the but-for cause of the injury. And if there is no factual causation, there cannot be legal causation. There is no causal chain to break. But even if Lloyd had shown factual causation, he could not show legal causation.

"Legal cause . . . is essentially a question of foreseeability. The relevant question here is whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Palay v. U.S.*, 349 F.3d 418, 432 (7th Cir. 2003). Or, as Justice Scalia colorfully put it: "Life is too short to pursue every human act to its most remote consequences; 'for want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action against a blacksmith." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 287 (1992) (Scalia, J., concurring in the judgment).

Here, Lloyd's injury was not a foreseeable result of Whirlpool's decision to omit higher height guidance from the hood's instruction manual. Lloyd's theory calls for a causal chain with too many links. Maybe it is foreseeable that people will burn things on a stovetop, and even start the occasional kitchen fire. Maybe it is foreseeable the people could be in a rush to put out those fires. And maybe it is foreseeable that if you install a range hood too low, you could hit your head. But it is not foreseeable that an instruction manual setting a minimum height for a hood would lead an installer to think that the minimum height is the *only* height, and that installing a hood with that assumption would lead to an injury.

In short, it is not a natural string of events. *See United States v. Laraneta*, 700 F.3d 983, 990 (7th Cir. 2012) ("The conventional definition of proximate cause was and remains that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred."); *Young v. Bryco Arms*, 213 Ill. 2d 433, 290 Ill. Dec. 504, 821 N.E.2d 1078, 1086 (2004) ("The proper inquiry regarding legal cause . . . ask[s] whether the injury is of a type that a reasonable person would see as a likely result of his conduct.") (citation omitted); *see generally Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). Lloyd's injury is far removed from any alleged design defect in the hood's instruction manual – too attenuated to support a finding of proximate causation.

Again, Lloyd is not challenging the installation of the hood *per se*. He is not bringing a failure to warn claim, either. He is challenging Whirlpool's failure to tell consumers that they could install the hood higher if they wanted to. According to Lloyd, Whirlpool should have foreseen that the failure to float that possibility would lead to an injury like his.

And that's where Lloyd's legal causation argument comes up short. The instruction manual listed 24 inches as the "min." It did not require the hood to hang 24 inches above the stove. *See* Installation Guide, at 2 (Dckt. No. 97-2). "Minimum" by definition sets a floor. It implies a range of possibilities, *i.e.*, that the hood could hang *more* than 24 inches above the cooking surface. *See* Merriam-Webster.com (last visited Sept. 20, 2022) ("*Minimum*. Noun. (1) the least quantity assignable, admissible, or possible. (2) the least of a set of numbers; specifically: the smallest value assumed by a continuous function defined on a closed interval.").

Whirlpool could not have foreseen that an installer would misinterpret the manual and be so influenced by the minimum number that he or she would choose to install the hood at its

19

minimum height, and that installing the hood at that height would lead to an injury. It's unreasonable to hold Whirlpool accountable for an installer's interpretation of the word "min." as meaning "only." That reading would require Whirlpool to foresee installers ignoring the plain meaning of their instructions.

All told, this Court cannot conclude that Whirlpool's conduct is "so closely tied to the plaintiff's injury that [it] should be held legally responsible for it." *Beretta U.S.A. Corp.*, 821 N.E.2d at 1127. When it comes to legal causation, the connection cannot be leaps and bounds away. Here, Lloyd provides not a connection but a canyon between Whirlpool's actions and his injury.

In sum, the record cannot support a finding of factual or legal causation by a reasonable jury. Lloyd cannot prove an essential element of his negligence claim, so he has reached the end of the road.

## Conclusion

For the foregoing reasons, Whirlpool's motion for summary judgment is granted.

Date: September 26, 2022

Steven C. Seeger
United States District Judge